CITY OF HAMMOND, Indiana,
a Municipal Corporation,
Appellant–Plaintiff,

v.

MARINA ENTERTAINMENT COMPLEX, INC., Great Lakes Inland Marina, Inc., Auditor of Lake County, Indiana, and Treasurer of Lake County, Indiana, Appellees–Defendants.

No. 56A05–9902–CV–87.

Court of Appeals of Indiana.

Aug. 8, 2000.

See also, 681 N.E.2d 1139.

Zeff A. Weiss, Curtis W. McCauley, Ice Miller Donadio & Ryan, Indianapolis, Indiana, Joseph Stalmack, Joseph Stalmack & Associates, Hammond, Indiana, Attorneys for Appellant.

Karl Mulvaney, Bingham Summers Welsh & Spilman, Indianapolis, Indiana, Terrance L. Smith, Smith & Debonis, Highland, Indiana, Attorneys for Appellees.

## OPINION

FRIEDLANDER, Judge

This appeal arises out of an eminent domain proceeding initiated in 1995 by the City of Hammond, Indiana against Great Lakes Inland Marina, Inc. (fee owner) and Marina Entertainment Complex, Inc. (lessee/optionee) [the Landowners]. At that time, the Landowners held a 13.679–acre parcel of real property [the parcel] located in Hammond adjacent to the city-owned Hammond Marina, which was the anticipated site for the development of a riverboat casino on Lake Michigan. The City of Hammond sought to condemn a permanent and a temporary construction easement on the parcel in order to build an overpass to the Hammond Marina. The overpass was part of an overpass and public roadway project planned by the City. At the conclusion of trial, the jury returned a verdict in excess of $5.2 million in favor of the Landowners. The trial court entered judgment in accordance with the verdict. The City of Hammond now appeals.[1]

The following restated issues are presented in this appeal:

1. Did the trial court err in allowing the Landowners to present damages evidence for loss of access resulting from the closing of Calumet Avenue, and was the verdict contrary to law in that damages were awarded for an adverse change in the property's highest and best use caused by the closing of Calumet Avenue?

2. Did the trial court err in allowing testimony regarding the enhanced value of the Landowners' property based on its proximity to the Hammond Marina, where a riverboat casino project was being developed?

3. Did the trial court err in allowing the Landowners to present evidence pertaining to a letter of intent entered into between the City and one of the applicants for the casino license, and did error occur when the Landowners argued in closing that the owner of Great Lakes Inland Marina, Inc. "got screwed" when the City sought to preserve the possible financial benefits of that letter of intent by closing Calumet Avenue?

We affirm.

The facts most favorable to the judgment are as follows. Michael Strain formed Great Lakes Inland Marina, Inc. and, in late 1989 or early 1990, it purchased the parcel from the Penn Central Railroad for $200,000. The parcel was located west of Calumet Avenue between the Conrail and the CSX railroad tracks and only a few hundred feet south, along Calumet Avenue, of the lakefront where the Hammond Marina was to be located. Great Lakes Inland Marina, Inc. thereafter went into business and provided boat storage services to the Hammond Marina, which opened in either 1990 or 1991.

After riverboat gambling legislation was introduced in the Indiana General Assembly in January 1993, Great Lakes Inland Marina, Inc. sent out letters advising that it had the only privately owned property near the Hammond Marina that might be used for a riverboat gambling development. On February 18, 1993, Great Lakes Inland Marina, Inc. and Alan Gull, a real

1. Oral argument was held in this case on March 6, 2000. This court stated during oral argument that it would take under advisement the City's September 7, 1999 "Verified Petition to Supplement Record of the Proceedings" with certain trial exhibits, including Great Lakes' Exhibits GL–66, GL–68, GL–79A and GL79B (engineering plans), retained by a court reporter for the Newton Superior Court. We hereby deny the City's petition to supplement the record. We also deny Great Lakes Inland Marina, Inc.'s May 8, 2000 motion to strike the City's submission of additional authority.

estate developer acting for and under the corporate name of Marina Entertainment Complex, Inc., entered into an agreement that granted Marina Entertainment Complex, Inc. an exclusive option to lease or purchase the parcel.

The gaming bill that provided for a riverboat casino to be located at the Hammond Marina went into effect in July 1993. Numerous companies hoped to obtain the Hammond riverboat gaming license.

The City formed a committee for the purposes of considering candidates for the Hammond license and recommending which of the candidates the City should endorse. The committee sent out a request for qualifications to candidates interested in securing the City's endorsement. Lake Michigan Charters (now known as the Empress), Carnival, Boyd, Mirage, and Gamma responded to the request for qualifications. In September 1993, the City entered into an agreement (Letter of Intent) with Lake Michigan Charters to endorse Lake Michigan Charters and to support its effort before the Indiana Gaming Commission to obtain the Hammond gaming license. Pursuant to the agreement, the City would endorse Lake Michigan Charters in return for three percent of the gross gaming revenues and payment of $3 for each casino patron's car parked on city-owned property.

After a Hammond gaming referendum passed in November 1993, Marina Entertainment Complex, Inc. advised Great Lakes Inland Marina, Inc. that it was exercising the lease/purchase option on the parcel. Marina Entertainment Complex, Inc. thereafter signed a lease agreement. Pursuant to the lease, which was for a ten-year term and contained other terms and conditions, Marina Entertainment Complex, Inc. would pay Great Lakes Inland Marina, Inc. rent of $25,000 per month for the first two years and rent of $200,000 per month for the next eight years. The lease further provided for an option to purchase the parcel during the term of the lease. Pursuant to the terms of the lease,

Marina Entertainment Complex, Inc. could purchase the parcel for $10 million during the first year of the lease, but the purchase price would increase by $1 million each subsequent year thereafter.

The lease commenced on January 1, 1994. By April 1994, three of the four gaming applicants for the Hammond license had made it known that they intended to use the parcel for their gaming development. The plans of the three gaming applicants showed Calumet Avenue open to the lakefront in order to facilitate their developments. Great Lakes Inland Marina, Inc. also began to develop potential plans, including placing a parking lot on the parcel.

In April 1994, Hammond commenced a condemnation suit against the Landowners. The City sought two easements on the parcel in order to build an overpass to the Hammond Marina. The Landowners contended at that time that Hammond was condemning their property not for the public good, but for the Empress's benefit. According to the Landowners in this appeal:

> The basis for the property owners' contention [in this regard] was the contract between Hammond and the Empress ("Letter of Intent") that required the Empress to design, build and pay for the overpass including any expenses and damages incurred in condemnation suits. Hammond countered that the overpass project and the casino project were separate and distinct projects and were not connected in any way, notwithstanding the fact that the Empress was paying for the condemnation. Ultimately, an appeal on that issue was commenced by the Landowners. In November 1994, just weeks before trial on the first condemnation suit, Hammond dismissed the suit without prejudice. The trial court awarded fees and expenses to the Landowners, which was affirmed on appeal.

Appellee's Brief at 5 (footnotes omitted).

On January 19, 1995, the City of Hammond's Board of Public Works and Safety

adopted a resolution (the Acquisition Resolution) that approved the purchase or condemnation of two easements on the parcel in order to build the overpass: 1) a permanent easement for an overpass right-of-way across a 0.458–acre portion of the parcel, and 2) a temporary construction easement on an adjacent 0.559–acre portion of the parcel. On that same date, the City also approved new plans (a version of Plan–F) for the overpass project that showed the permanent closing to vehicular traffic of Calumet Avenue just north of the Landowners' property. Plan–F resulted in placing the parcel on a dead-end road.[2]

On February 15, 1995, the City offered the Landowners $6041 to purchase the easements. When the Landowners did not accept the purchase offers, the City initiated this eminent domain proceeding by filing its complaint on April 7, 1995. The Landowners filed objections to the eminent domain proceedings.

In April 1995, Marina Entertainment Complex, Inc. learned of the City's plans to permanently close Calumet Avenue and thereafter stopped making rent payments to Great Lakes Inland Marina, Inc., claiming that the closing of Calumet Avenue prevented the use of the parcel for gaming development, a use condition specified in the lease. Great Lakes Inland Marina, Inc. also stopped all development plans for the parcel because the use of Calumet Avenue for ingress and egress from the lakefront was a necessary element of its development.

A hearing on the Landowners' objections to the eminent domain proceeding (Take Hearing) was held on July 12, 1995. At the Take Hearing, the parties stipulated the Acquisition Resolution into evidence. The City also introduced into evidence a version of Plan–F, dated March 31, 1995, that depicted the City's design for the overpass and the road project. At the conclusion of the Take Hearing, the trial court entered a preliminary order overruling the Landowners' objections and found that the City had properly exercised its power of eminent domain through the Acquisition Resolution.

The City thereafter submitted a proposed order of appropriation, to which Great Lakes Inland Marina, Inc. objected. On August 21, 1995, the trial court adopted the City's proposed order of appropriation. In the Order of Appropriation, which contained findings of fact and conclusions of law, the trial court found, among other things, that the existing public access to the City's lakefront was provided by Calumet Avenue and that Calumet Avenue did not provide adequate access to the lakefront. The trial court further found that the construction of the public vehicular overpass and roadway contemplated by the City would eliminate or reduce traffic congestion, facilitate the flow of traffic, substantially reduce public safety concerns, and generally provide improved public access to the lakefront area. The trial court concluded that the construction of a public vehicular overpass and roadway was an appropriate public use, and that the proposed use of the overpass and roadway constituted an immediate or fair and reasonable future public use for the real estate. The trial court entered a judgment, finding that the City could appropriate the two easements.[3] The trial court also appointed three appraisers to determine the compensation owed to the Landowners.

The court-appointed appraisers filed reports on October 13, 1995. Both Great Lakes Inland Marina, Inc. and the City

2. After Calumet Avenue was closed, the distance to be traveled from the parcel to the Hammond Marina increased from approximately 400 feet to 1.7 miles. The City claims that it did not make a final determination to close Calumet Avenue until December 14, 1995, and that, on the date the easements were taken, it was considering whether to close Calumet Avenue between the Landowners' property and the Hammond Marina, but had not made a final decision to do so.

3. The Landowners appealed the Order of Appropriation, and this court affirmed in an April 21, 1996 memorandum decision.

filed exceptions to the appraisers' reports. One of Great Lakes Inland Marina, Inc.'s objections was that the appraisers had not considered the effect of the proposed closing of Calumet Avenue on the value of the parcel.[4] Great Lakes Inland Marina, Inc. also filed a three-count counterclaim against the City. Count I was for inverse condemnation. Count II alleged tortious interference with a contract. Count III alleged 42 U.S.C. § 1983 violations.

In July 1997, the City filed two motions in limine. In the first, the City sought to exclude:

> "evidence of any increased or appreciated value of the condemned property or comparable properties brought about by the 'project', which constitutes gaming and the construction of the vehicular overpass, both of which were interdependent upon one another, and evidence of any gaming adjustment in valuing comparables and the condemned property by any of the expert appraisers."

Appellant's Brief at 7 (quoting *Record* at 662). In the second, the City sought to exclude: "evidence of alleged damages sustained by [the Landowners] from the closure of Calumet Avenue in the manner proposed by [the City]". Appellant's Brief at 7–8 (quoting *Record* at 692). The trial court eventually denied the motions in limine.

In July 1998, the City filed motions, to which the Landowners agreed, for separate trials involving the City's complaint and the Landowners' three-count counterclaim. The Landowners argued, however, that their damages from the closing of Calumet Avenue should be allowed as part of the damages to be assessed in the City's condemnation action. The trial· court ruled that Great Lakes Inland Marina, Inc. could introduce "any relevant admiss[i]ble evidence in support of its claim for damages to the residue of its property cause[d] by the closing of Calumet Avenue." Ap-

pellant's Brief at 8 (quoting *Record* at 1390).

The City filed a motion for summary judgment in July 1998 on count II (tortious interference with contract) and count III (42 U.S.C. § 1983) of the Landowners' counterclaim, and the trial court granted the motion with regard to count III.

On July 16, 1998, the trial court entered a scheduling order in which it stated, *inter alia,* that all motions in limine were to be filed by September 1, 1998.

On September 8, 1998, trial began in the City's condemnation action. The case was tried over the course of twelve days. Trial with regard to the counts in the Landowners' counterclaim was left for another day.

On September 24, 1998, during the course of trial, the City filed its seventh motion in limine. The City sought to exclude evidence of any alleged antagonism by the City toward Great Lakes Inland Marina, Inc., Michael Strain, Marina Entertainment Complex, Inc., or Alan Gull or any motive by the City regarding the location or design of the vehicular overpass, the closure of Calumet Avenue, the location of the closure of Calumet Avenue, and the manner of construction of the Hammond Marina Overpass project. After entertaining argument on the seventh motion in limine, the trial court entered an order in which it found that the motion was "untimely filed and therefore waived." *Record* at 1815.

During the trial, witnesses for both the City and Great Lakes Inland Marina, Inc. testified with regard to the highest and best use of the parcel and the impact of the closing of Calumet Avenue on the highest and best use.

The appraisers retained by Great Lakes Inland Marina, Inc. testified with regard to the highest and best use of the parcel as of and after May 15, 1995. William Kimmel, a real estate appraiser and casino development consultant, testified that the

---

4. This exception, concerning the effect the proposed closing of Calumet Avenue had on the highest and best use of the parcel, was the primary issue at trial.

highest and best use of the parcel before the take was parking for a gaming operation. Kimmel further opined that, with Calumet Avenue closed south of the marina but north of the parcel, the parcel could not be used economically or functionally for casino-related parking. Will Stump, a real estate appraiser and consultant, testified that the highest and best use of the parcel before the take was gaming-related commercial use and that, after the closing of Calumet Avenue, the parcel could not be used for a gaming-related purpose. According to Stump, "immediate or approximate access to the gaming site would be necessary to maintain that highest and best use." *Record* at 3661. Stump further opined that damages sustained by the parcel due to the closing of Calumet Avenue were peculiar and special because the parcel was the only privately owned property close to the gaming site. Real Estate Appraiser and Consultant Dale Kleszynski testified that, because of the closing of Calumet Avenue, the parcel could no longer be used for gaming-related purposes, and its highest and best use became that of a "real secondary industrial site." *Record* at 3890. John Hammerschlag, a parking development and advisory services consultant, testified that the parcel was suitable for casino parking before May 15, 1995, but that it was rendered useless for casino parking after that date. Great Lakes Inland Marina, Inc. presented evidence that it suffered between $9.5 million and $13.6 million in damages as a result of the overpass project and the closing of Calumet Avenue.

The City presented evidence that Calumet Avenue was closed as a result of safety concerns and that the closure of Calumet Avenue had little or no impact on the parcel and its potential use for casino parking purposes.

After the jury retired to begin deliberations, the City moved for a mistrial on the basis that Terrance Smith, an attorney for Great Lakes Inland Marina, Inc., argued in rebuttal closing argument that the City

benefited and Strain "got screwed", *Record* at 5265, when the City closed Calumet Avenue in order to retain the financial benefits of its agreement with Lake Michigan Charters (the Empress), pursuant to which the Empress would use City property for gaming-related parking and reimburse the City $3 for each car parked on City-owned property. The trial court denied the motion for a mistrial.

The jury returned a verdict of $5,027,200 in favor of Great Lakes Inland Marina, Inc. and a verdict of $200,000 in favor of Marina Entertainment Complex, Inc. The trial court entered judgment in accordance with the verdict. The Landowners thereafter voluntarily dismissed with prejudice their counterclaims for inverse condemnation and tortious interference with contract.

The City filed a motion to correct error, which the trial court denied. This appeal ensued.

1.

The City claims that the trial court erred in allowing the Landowners to recover damages for the closing of Calumet Avenue in the City's direct condemnation action. The City essentially claims that: 1) the closing of Calumet Avenue was not part of the take as defined in the order of appropriation, 2) the order of appropriation was the law of the case, 3) no final action was taken with regard to the closing of Calumet Avenue as of May 15, 1995 and therefore any claim for damages for the closure of Calumet Avenue was not ripe, and 4) the trial court did not determine that the closure of Calumet Avenue constituted a taking.

■ It is well established that, in condemnation proceedings,

"[A]ll damages, present or prospective, that are the natural or reasonable incident of the improvement to be made or work to be constructed ... must be assessed. Damages are assessed once and for all, and the measure should be the entire loss sustained by the owner,

including in one assessment all injuries resulting from the appropriation."

*Rehman v. New Albany B. & T.R. Co.*, 8 Ind.App. 200, 35 N.E. 292, 296 (1893) (quoting *Chicago & Indiana Coal Railway Co. v. Hunter,* 128 Ind. 213, 27 N.E. 477 (1891)). Thus, every injury a property owner suffers as a result of an improvement made in an eminent domain proceeding is recoverable in the condemnation case, notwithstanding the fact that such injury may not appear in the order of appropriation. *Rehman* also makes clear that, in order to recover damages suffered as the result of an improvement, the property owner *must* have those damages assessed in the condemnation case. Quoting 2 Wood, Ry. Law, § 256, the court in Rehman stated:

> "The presumption is that every injury which, in judgment of law, would result to the other adjacent property of the owner from taking a part of his land for the construction of the road, and from the use of it in a proper manner when constructed, was foreseen by the appraisers, and included in their first estimate. The award made by the statutory tribunal is exhaustive, and the landowner cannot maintain an action for damages which should have been, but were not, assessed and allowed in that proceeding, even though he claimed them there, and they were erroneously disallowed."

*Rehman v. New Albany B. & T.R. Co.*, 8 Ind.App. 200, 35 N.E. at 295.

The court in *Rehman* further stated: "[A]ppraisers are required to consider and award compensation for all damage of every character which is or may be sustained by reason of the appropriation of the land to the uses contemplated." *Id.* at 296. The damages section of the condemnation statute, Ind.Code Ann. § 32–11–1–6 (West Supp.1999), addresses the duties of appraisers in eminent domain proceedings. Subsection (4) of that statute provides for the recovery of damages that will result from the construction of the improvements

in the manner proposed by the plaintiff. IC § 32–11–1–6 states in pertinent part:

> Such appraisers shall take an oath that they have no interest in the matter and that they will honestly and impartially make such assessment. After being so sworn, the judge shall instruct said appraisers as to their duties as such and the measure of the damages and benefits if any they allow. They shall determine and report:
>
> (1) the fair market value of each parcel of property sought to be appropriated, and the value of each separate estate or interest therein;
>
> (2) the fair market value of all improvements pertaining to the realty, if any, on the portion of the real estate to be condemned;
>
> (3) the damages, if any, to the residue of the land of such owner or owners to be caused by taking out the part sought to be appropriated; and
>
> (4) such other damages, if any, as will result to any persons or corporation from the construction of the improvements in the manner proposed by the plaintiff.

 Subsection (4) above was intended to compensate a person for damages resulting from the method of construction in a physical sense and to cover such conditions as a total denial of access due to the method of construction. *State v. Heslar,* 257 Ind. 307, 274 N.E.2d 261 (1971). The inconvenience arising from an increased difficulty of access is a proper matter for consideration in arriving at the amount of damages that arise from a taking. *State v. Ahaus,* 223 Ind. 629, 63 N.E.2d 199 (1945).

 The Landowners in this case suffered damages by being placed on a dead-end road and being denied reasonable access to the lakefront as a result of the construction of a fence across Calumet Avenue in the manner proposed by the City of Hammond. Accordingly, IC § 32–11–1–6(4) provided a proper basis for the Land-

owners' recovery of damages for the closure of Calumet Avenue. Because the Landowners suffered damages due to the closure of Calumet Avenue that were the natural or reasonable incident to the improvements to be made by the City, the Landowners were entitled to present evidence with regard to those damages and to have them assessed in the condemnation case. 'The Landowners were not therefore required to institute and maintain a separate action for inverse condemnation in order to recover damages for the closure of Calumet Avenue.

■ We are not persuaded by the City's argument that the order of appropriation was the law of the case and that, because the closing of Calumet Avenue was not included in the order of appropriation, the Landowners cannot recover damages resulting from such closure. Condemnation proceedings involve two stages: 1) an initial or summary phase, and 2) a phase where the trial court or jury determines the amount of damages sustained by the landowner. *State ex rel. Board of Aviation Comm'rs of the City of Warsaw v. Kosciusko County Superior Court,* 430 N.E.2d 754 (Ind.1982). In *State ex rel. Board of Aviation Comm's of the City of Warsaw v. Kosciusko County Superior Court,* our supreme court stated:

> During the initial or summary phase of the proceedings, the action consists solely of legal issues which are decided by the trial court. The proceeding is initiated by the filing of a condemnation complaint pursuant to Ind.Code § 32–11–1–2. Objections may be filed to the complaint, Ind.Code § 32–11–1–5; however, no responsive pleading is necessary at this stage. After a consideration of the legality of the action and any objections which may have been filed, the trial court concludes this phase of the proceedings by entering an order of appropriation and appointing appraisers to assess the damages. Ind.Code § 32–11–1–4 and 32–11–1–5. . . .

> During the second stage of the condemnation proceedings, the trial court, or a jury if requested, must determine the amount of damages sustained by the landowner. The appraisers' report is filed with the court, and defendants may then file exceptions to this report. *The issues are formed as a matter of law upon the filing of the exceptions to the appraisers' award* . . . .

\* \* \*

Therefore, the filing of exceptions to the appraisers' report is a necessary responsive pleading which closes the issue of damages. We have clearly held that:

> "It is the law that the issues to be tried in condemnation proceedings are those joined and raised by the report of the appraisers as to the benefits and damages assessed and the exceptions filed thereto by the aggrieved party." *State ex rel. Dillon v. Superior Court of Marion County,* (1968) 249 Ind. 340, 342, 232 N.E.2d 602, 603[, *superceded in part on other grounds, State ex rel. Prosser v. Lake Circuit Court,* 565 N.E.2d 751 (Ind.1991) ].

*Id.* at 755 (emphasis added; some citations omitted). As explained above, because 1) the order of appropriation is merely a part of the first of two stages of a condemnation proceeding, 2) a landowner is not required to file even a responsive proceeding until the second stage of the condemnation proceeding, and 3) the issues to be tried in a condemnation proceeding are determined by the appraisers' report and the exceptions filed thereto, there is no merit to the City's argument that the Landowners could not recover damages for the closing of Calumet Avenue because the issue of the Landowners' damages for the closing of Calumet Avenue was not included in the order of appropriation.

■ There is also no merit to the City's argument on appeal that a claim for damages for the closure of Calumet Avenue was not ripe as of May 15, 1995. The

City approved plans as early as January 1995 and introduced, at the take hearing, Plan–F that showed Calumet Avenue closed to vehicular traffic. The trial court found in the order of appropriation that, "the current location and design of the proposed vehicular overpass and roadway have been approved by the City Engineer and an independent engineering firm." *Record* at 207. The Landowners' claim for damages for the closure of Calumet Avenue was ripe before December 1995, when the City claims it made its final decision to close Calumet Avenue. In any event, a condemnee may be compensated for prospective damages that are the natural and reasonable result of the taking. *City of Elkhart v. No–Bi Corp.*, 428 N.E.2d 43 (Ind.Ct.App.1981). Thus, even if the final decision to close Calumet Avenue was not made until December 1995, as the City claims, the jury could have properly awarded damages for the prospective closing of Calumet Avenue.

Also without merit is the City's claim that the Landowners could not recover damages for the closing of Calumet Avenue because the trial court never determined that the closing of Calumet Avenue constituted a taking within the scope of the eminent domain statute. First, such a determination is a requirement in an inverse condemnation case, not a direct condemnation case. *See Jenkins v. Board of County Comm'rs of Madison County*, 698 N.E.2d 1268 (Ind.Ct.App.1998) (finding that a taking has occurred is the first stage in an inverse condemnation proceeding), *trans. denied*. Second, even assuming that the trial court was required to make such a determination, its action in allowing that issue to go to the jury manifests a determination that the closing of Calumet Avenue constituted a taking within the scope of the eminent domain statute.

### 2.

■ The City next claims that the trial court erred in allowing testimony regarding the enhanced value of the Landowners' property based on its proximity to the Hammond Marina, where the riverboat casino project was being developed. It claims that the landowners were not entitled to enhanced compensation because the anticipated development of a casino at the Hammond Marina depended upon the construction of the overpass for which the easements were taken.

■ It is well established that "neither an increase nor a decrease in the market value of the property sought to be taken, which is brought about by the same project for which the property is being taken, may be considered in determining the value of the property." *State v. Sovich*, 253 Ind. 224, 252 N.E.2d 582, 588 (Ind.1969). In this case, the trial court determined that "the construction of the overpass was a separate and distinct project to that related to the development undertaken to facilitate gambling." *Record* at 1067. There was no evidence presented at trial that the casino and overpass projects were one and the same. In fact, the City's own engineer, Stanley Dostatni, testified that the City considered building an overpass as early as 1989 or 1990, when the plans for the Hammond Marina were first being developed. In addition, in a prior appeal before this court, Hammond contended that the overpass project and the riverboat casino project were separate projects. Because the overpass and casino projects were separate and distinct, the rule set forth in *Sovich* is inapplicable.

### 3.

The City claims that the trial court erred in allowing the Landowners to present evidence of the terms of the Letter of Intent. It claims that such evidence was irrelevant and prejudicial and that the trial court erred in failing to exclude it. The City further claims that the trial court compounded its error when it permitted the Landowners to make the City's motive in closing Calumet Avenue the focus of their closing argument, including arguing that the City "screwed" Strain in order to preserve the financial benefits of the Letter of Intent.

The Landowners presented evidence that, pursuant to the Letter of Intent, the City would receive $3 for every patron car parked on City property. Such evidence was relevant in that it showed the value of the property and that the parcel's highest and best use was for casino parking. The trial court did not err in allowing the Landowners to present evidence pertaining to the Letter of Intent. In addition, the trial court did not err in allowing the Landowners to submit evidence of and present argument regarding the City's motive in closing Calumet Avenue. A trial court generally may not consider a condemning authority's motives in bringing an eminent domain action, *Indianapolis Water Co. v. Lux,* 224 Ind. 125, 64 N.E.2d 790 (1946). Nonetheless, because the City and not the Landowners first raised the issue of the City's motives in closing Calumet Avenue during the trial in this case, the City opened the door to such evidence and argument, and the Landowners were therefore entitled to present their own evidence with regard to the City's motives in closing Calumet Avenue. Thus, even if it was error to place the City's motive into evidence, the City cannot now take advantage of such error. *See Jolly v. Modisett,* 257 Ind. 426, 275 N.E.2d 780 (1971) (a party may not take advantage of errors which he himself committed, invited, or induced the trial court to make). Finally, by failing to object until after the jury retired to deliberate, the City waived review of its argument that reversible error occurred when the Landowners argued in closing that Strain "got screwed" when the City sought to preserve the possible financial benefits of the Letter of Intent by closing Calumet Avenue.

Judgment affirmed.

DARDEN, J., and MATTINGLY, J., concur.